UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

KRISSI WATKINS,                    )
                                   )
        Plaintiff,                 )          No. 5:18-CV-548-REW-MAS
                                   )
v.                                 )
                                   )          OPINION AND ORDER
SHRINERS HOSPITALS FOR             )
CHILDREN, INC.,                    )
                                   )
        Defendant.                 )

*** *** *** ***

Defendant Shriners Hospitals for Children, Inc., moves for summary judgment on Plaintiff Krissi Watkins's disability discrimination, failure to accommodate, and retaliation claims under the Americans with Disabilities Act (ADA), as amended, and the Kentucky Civil Rights Act (KCRA). The KCRA, more narrowly defining a qualifying disability, affords Watkins no relief as a matter of law. Material fact disputes, however, prevent summary judgment on the federal claims. The Court thus grants the motion in part and denies it in part.

Would a charitable hospital, known for its beneficence toward disabled children, intentionally pull a job from a woman newly hired but newly diagnosed with invasive breast cancer? Would a woman, jobless and just diagnosed with invasive breast cancer, voluntarily turn away from a new job featuring immediate health insurance coverage? These difficult questions hinge not on rhetoric or reputation, but instead on evidence of record. In this case, a jury must sift the proof and make credibility determinations in a dispute offering often binary options on key issues.

1

**A. Factual and Procedural Background**

The Court views all proof and draws supported inferences in the light most favorable to non-movant Watkins. Plaintiff worked in various administrative support positions at the University of Kentucky (UK) Hospital from 2007 until 2018; from roughly 2015 to 2018, she served as an insurance specialist in the UK Department of Anesthesiology's Interventional Pain Associates Clinic, under the supervision of Brian Howell. DE #26-2 at 3–4 (Watkins Dep.);[1] *id.* at 43 (Howell Dep.). On January 26, 2018, Watkins notified Howell of her resignation from UK, with her final day being February 22, to seek a position in her degree field with greater advancement opportunity.[2] *Id.*; DE #26-3 (Resignation Letter). Five days later, Plaintiff applied for the open Revenue Cycle Coordinator position at Shriners. DE #26-4 (Employment Application); DE #26-2 at 4 (Watkins Dep.). Watkins interviewed with Shriners Revenue Cycle Manager Ambra Knoche via telephone in early February, and she attended an in-person interview with Knoche shortly afterward. DE #29-3 at 8, 15 (Knoche Dep.); DE #26-2 at 8–9 (Watkins Dep.). Knoche ultimately offered the position to Watkins, and Watkins accepted it, on or about February 5, 2018. DE #26-2 at 10.

Concerned about a potential lapse in benefits during the employment transition, Watkins subsequently scheduled a routine mammogram. *Id.* at 12–13 (Watkins Dep.). Unfortunately, the mammogram revealed a likely cancerous mass. *Id.* at 12–14. Watkins approached Howell to

---

[1] Deposition citations refer to the CM/ECF pagination.

[2] Emphasizing Howell's testimony that Watkins had some performance issues (most, mistakes Howell and Watkins simply "discussed throughout the workday") and a personality conflict with another supervisor, *see* DE #26-2 at 44–45, Shriners suggests that Plaintiff's job was in jeopardy when she decided to leave it. *See* DE 26-1 at 3. Howell's testimony does not legitimately reflect that UK planned to terminate Watkins in early 2018. Regardless, in this context, the Court accepts Watkins's representation, per her testimony and the resignation letter, that she resigned for professional development reasons.

inquire whether she had any option of remaining in her position at UK, to permit health benefit continuity; Howell informed her that he would discuss the matter with his superiors. *Id.* at 14. On February 14, 2018, Knoche provided Watkins with a Shriners start date of February 26. *Id.* at 30. Later that day, after receiving biopsy results, Plaintiff's healthcare provider confirmed the breast cancer diagnosis.[3] *Id.* Watkins then followed up with Howell, who advised that Watkins could not remain at UK. *Id.* at 14; *id.* at 55–56 (Howell Dep.).[4] Plaintiff immediately called Knoche to discuss the situation. *Id.* at 14 (Watkins Dep.). [Much of the Watkins-Shriners interaction is contested; the Court largely traces Plaintiff's version, per Rule 56.] Knoche, ostensibly sympathetic, noted that she was not sure of Watkins's options regarding benefits or attendance flexibility, but would consult Human Resources (HR) and get back in touch with Watkins. *Id.* at 15 ("She said she didn't know the benefits or as far as the attendance, how that would work with me having to have treatment, that she was going to reach out to HR."); *id.* at 16 ("She told me that she didn't know how it would work about my position as far as me having this diagnosis, needing treatment, or the benefits and that she would look into it and get back with me."); DE #29-3 at 19 (Knoche Dep.) ("And she asked about benefits and I did not feel comfortable having that conversation because that's not my area of expertise. But I was happy to get a call set up with HR

---

[3] It is not clear from the record whether Watkins received the specific Invasive Ductal Carcinoma diagnosis on February 14. She simply testified that she then learned she had cancer. DE #26-2 at 14. Watkins obviously knew the specific diagnosis by February 15, as she referenced it in her email to Knoche of that date. DE #26-7. Knoche, emphasizing the perceived lack of certainty surrounding Watkins's diagnosis and treatment plan, testified that Watkins did not mention the specific cancer type on either the February 14 or February 15 calls with Shriners. DE #29-3 at 24.
[4] The parties dispute UK's reason for declining to permit Watkins to rescind her resignation. Watkins's understanding was that UK had already advertised her position as available. DE #26-2 at 14. Howell, though, testified that he and his supervisor agreed that it was best to let the resignation stand, allowing UK to bring someone new, perhaps with stronger performance and less personality conflicts, into the insurance specialist role. *Id.* at 55–57. The dispute is not legally material to the claims in this case. UK closed the door on remaining.

and we would be able to do that the next day . . ."); *id.* ("This was definitely something that was beyond what I could give her information on . . ."). Though Watkins did not yet have a cancer treatment plan in place, she told Knoche that she had an appointment set for February 27 (after the Shriners start date of February 26) to discuss it; Knoche reiterated that she could not guarantee that Watkins would be permitted time off of work (for the February 27 appointment or any other treatment), but she would consult HR. DE #26-2 at 28–29 (Watkins Dep.). Watkins described Knoche has making a "heavy sigh" at mention of the February 27 treatment-planning appointment. *Id.* at 28.

The following day (February 15), Knoche, Watkins, and Shriners HR Director Debra Felder had a three-way telephone conversation. DE #26-2 at 18 (Watkins Dep.). Knoche advised that she had discussed Watkins's diagnosis and situation with Felder and cautioned that, because Watkins would not qualify under Family Medical Leave Act (FMLA) guidelines for ninety days and was hired for a "unique" position, she would not be permitted absences during that period; thus, per Knoche and Felder, if Watkins "needed to take more than three times off," Shriners "could not secure [her] position." *Id.* at 19; *id.* at 20 ("Debra [restated] the fact that the position was unique and that because of the FMLA guidelines and treatments that I wouldn't be allowed to take off without getting on probationary action."); *id.* ("I asked her what my options were. I said, I know that people work with cancer treatments all the time . . . And she reiterated the fact that if I had more than three occurrences that  . . . she wouldn't feel comfortable telling me that I would be able to work there because of the disciplinary action."); *see also id.* at 22 ("I asked them how my treatments would affect my schedule, if I had to have treatments, how would it affect my schedule, what are their guidelines and rules."); *id.* at 40 (". . . I asked if I had to miss doctor's appointments and if I was going to treatments if I could still work for Shriners. And I was told that

if I missed more than three occurrences for appointments that . . . I could not have my position secured.").

After this discussion, Felder left the call, and Knoche and Watkins talked further about how to proceed. *Id.* at 20. Though Knoche suggested Watkins consider it overnight, Watkins, per her testimony, felt that she would be unable to comply with the three-absence policy—an unwavering requirement, as she understood it, of the job—given her upcoming expected treatment needs. *Id.* at 20–21 ("And then she said . . . [would] I think about it overnight? And I said, you are telling me that there's nothing else that I can do; your human resources person is telling me there's nothing else I can do.").[5] Watkins, thus certain that Shriners would be unable to "secure" her

---

[5] It must be said that Shriners describes things quite differently. Knoche claims she reacted to Watkins by expressly confirming that the cancer diagnosis would have no effect on her Shriners position. *See* DE #29-3 at 19 (Knoche Dep.). Both Felder and Knoche deny any effort by Watkins to broach the issue of missed work or how Shriners would react to absences. Indeed, each of Felder and Knoche describe a benign call where Felder simply ran through on-board benefits and then Watkins abruptly announced that she would not be switching jobs at that point. *See id.* at 19, 21–22 (Knoche Dep.); DE #29-4 at 21 (Felder Dep.). The Shriners witnesses flatly deny Watkins's depiction and describe an entity ready, willing, and able to accommodate someone facing cancer treatment. *See* DE #29-4 at 21 (Felder Dep.) ("I express my empathy about her recent diagnosis, and then I provide her information . . . in regards to our benefits . . . [A]fter the end of the benefit review, I asked Ms. Watkins did she have any questions. And she said, 'No.' She said, 'I don't feel that this is a good time for me to take a new job.' . . . I said, 'I completely understand if this is not a good time for you to change jobs . . . However, you do not have to make a decision today. Why don't you take a couple of days to think about it?'"); DE #29-3 at 21 (Knoche Dep.) ("Krissi said that she didn't feel like it was a good time for her to take the position . . . and Debbie said she would like for her to think about it. It wasn't something that we didn't want her to take at that time. We wanted her to come because we needed the help. We didn't feel like the breast cancer would be an issue . . .").

The Court does not pick between versions at this stage. Watkins knew the UK job was over, so it is unlikely, perhaps, that she (thus not employed and facing lost pay and benefits) would have expressed a choice against taking a "new" job. Shriners was her only job at the time, thus a Hobson's choice. Further, the email Watkins sent after the February 15 call is, in tone and content, a difficult one to reconcile internally and externally. The key is the diametric versions told, and the Court is not the factfinder when tales, supported with record evidence, collide.

5

position in light of the cancer treatment, asked Knoche for advice on next steps. Knoche told her that, to be considered for positions at Shriners in the future, Watkins would need to formally rescind her acceptance of the Revenue Cycle Coordinator job offer. *Id.* at 37 ("She told me in the conversation with her when I asked her what I needed to do since she could not secure my position, her words were, you will have to rescind [acceptance of] the offer."); *see also id.* at 38. Based on this conversation, immediately following the February 15 call, Watkins emailed Knoche rescinding acceptance of the position. DE #26-7 (titled "Rescinding my position for Revenue Cycle Coordinator"). The email evinces Plaintiff's understanding that, due to her cancer treatments, she would not be able to keep the Revenue Cycle Coordinator position. *Id.* ("Per our conversation, I have recently been diagnosed with Invasive Ductal Carcinoma of my breast and will unfortunately need a series of treatments to overcome the diagnosis . . . I truly am saddened I will not get to work with you right away and represent the Shriner's Hospital brand."). Watkins further noted her interest in consideration for future Shriners positions. *Id.*

The cheery email tone did not last. Watkins soon filed an EEOC complaint over the alleged treatment by Shriners. Upon receipt of a right to sue letter, *see* DE #1-1 at 15, Plaintiff sued Shriners in Fayette Circuit Court*, see id.* at 5 (Complaint). Though Shriners argues otherwise, and the Complaint lacks ideal structural clarity, Watkins fairly asserted three causes of action, each under both the ADA and the KCRA—disability discrimination, failure to accommodate, and retaliation.[6] Shriners timely removed the case. DE #1 (Notice of Removal). Defendant now seeks

---

[6] Though the Complaint is structured as having only two separate counts, the first, Count I, fairly encompasses both disability discrimination and failure to accommodate sub-theories. Indeed, Watkins titles Count I "Disability Discrimination – Failure to Accommodate." DE #1-1 at 10. Further, within it, and in addition to the failure to accommodate allegations, she specifically avers: "Defendant discriminated against Plaintiff on the basis of her disability, in violation of the KCRA and the ADA/ADAAA." *Id.* at 11, ¶ 56. A reasonable reading of the Complaint demonstrates that Watkins pleaded both claim varieties.

summary judgment on all claims. DE #26 (Motion). Watkins responded in opposition, *see* DE #29, and Defendant replied, *see* DE #31.

### B. Summary Judgment Framework

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmovant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Courts may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986). "The relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson*, 106 S. Ct. at 2512).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec. Indus. Co.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

### C. ADA Disability Discrimination Claim

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "To recover on a claim for discrimination under the ADA, a plaintiff must show that he or she (1) is disabled, (2) otherwise qualified to perform the essential

8

functions of the position, with or without accommodation, and (3) suffered an adverse employment action because of his or her disability." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016). An ADA plaintiff need not show that her disability was the sole reason for the challenged employment action; she simply must show that the action occurred "because of" her protected status, *i.e.*, that her disability was a but-for cause of the employment action. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012).

A plaintiff may demonstrate disability discrimination "by introducing direct evidence of discrimination, including evidence that the employer relied upon the plaintiff's disability in making its employment decision, or by introducing indirect evidence of discrimination." *Ferrari*, 826 F.3d at 891 (quotation marks and citation omitted). The indirect method is applicable in cases involving allegedly pretextual bases for employer action and hidden intent issues. *Id.* Watkins purports to use the direct method here, and the proof indeed makes such an approach appropriate. Per Plaintiff's version of events, on the February 15 call, Shriners straightforwardly expressed inability to "secure her position" because of the cancer diagnosis and Watkins's related treatment needs; it made clear that the change in her employment status—the requirement that she rescind her offer acceptance in writing, to preserve potential future consideration—hinged on Plaintiff's cancer status. "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Tepper v. Potter*, 505 F.3d 508, 516 (6th Cir. 2007) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (citation omitted)). There is little dispute that Watkins's separation from Shriners was the result of her cancer diagnosis; the sole and crucial question in this regard is whether Watkins voluntarily chose to rescind her acceptance, or Knoche and Felder coerced it. Watkins's perception of the February 15 conversation and coercion allegation, if credited, directly support her

9

discrimination claim. No inferences are needed, and the indirect method is therefore inapt in this case.

"Where the ADA claim is based on direct evidence of discrimination," the claimant must initially "show that she (1) has a disability, and (2) is otherwise qualified for the position, either (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation." *Kempter v. Michigan Bell Tel. Co.*, 534 F. App'x 487, 490 (6th Cir. 2013) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007) (internal quotation marks omitted)); *accord Ferrari*, 826 F.3d at 891. If the plaintiff makes this showing, "the burden shifts to the employer to prove that the challenged job criterion is essential (defeating the employee's showing in (b)) or that the proposed accommodation will impose an undue hardship upon the employer (defeating the employee's showing in (c))." *Kempter*, 534 F. App'x at 491 (quoting *Kleiber*, 485 F.3d at 869 (internal quotation marks omitted)). Shriners does not argue that Watkins was not otherwise qualified for the Revenue Cycle Coordinator position, nor does it claim that any sort of modified work schedule (or exceptions to the three-absence policy) to accommodate her cancer treatments would have imposed an undue hardship on the company. Rather, Defendant maintains that (1) Watkins was not, at the time she rescinded her acceptance of the Shriners position, disabled within the meaning of the ADA and (2) Watkins suffered no adverse employment action, as she voluntarily chose to rescind her acceptance. The Court discusses each key dispute in turn.

*Cancer as an ADA-Qualifying Disability*

Under the ADA, a qualifying disability includes: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))."

10

42 U.S.C. § 12102(1). Watkins argues that she qualifies under the first (actual disability) and third (regarded-as) prongs. Congress has directed that the current version of the ADA, as amended in 2008 with enactment of the ADA Amendments Act (ADAAA),[7] "should be construed 'in favor of broad coverage . . ., to the maximum extent permitted by the [ADA's] terms.'" *Barlia v. MWI Veterinary Supply, Inc.*, 721 F. App'x 439, 445 (6th Cir. 2018) (quoting 42 U.S.C. § 12102(4)(A)). "Congress also cautioned that the question of whether an individual's impairment is a disability . . . should not demand extensive analysis." *Id.* (quotation marks and citation omitted). In other words, per the ADAAA and EEOC implementing regulations, the focus in disability discrimination cases "should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity." 29 C.F.R. § 1630.2(j)(1)(iv).[8]

In post-amendment cases, the regulations contemplate that cancer "will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity[,]" *see id.* § 1630.2(j)(3)(ii), because "cancer substantially limits normal cell growth[,]" *see id.* § 1630.2(j)(3)(iii). Still, individualized assessment of the impairment's limiting effects, to some degree, is required:

> [C]ancer can—and generally will—be a qualifying disability under the ADA. Nevertheless, "[t]he determination of whether an impairment substantially limits a major life activity requires an individualized assessment." 29 C.F.R. § 1630.2(j)(1)(iv). Although the ADAAA makes the individualized assessment "particularly simple and straightforward" for diseases like cancer, 29 C.F.R.

---

[7] Pub. L. No. 110-325, § 2, 122 Stat. 3553 (2008).

[8] EEOC implementing regulations, though not binding, are persuasive interpretive guidance regarding ADA protections and requirements. *See, e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 106 S. Ct. 2399, 2404 (1986) (explaining that administrative regulations, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance") (internal quotation marks and citation omitted); *Burns v. Coca-Cola Enterprises, Inc.*, 222 F.3d 247, 258 n.6 (6th Cir. 2000) (recognizing that EEOC regulations pertaining to the ADA are, though non-binding, helpful guidance).

> § 1630.2(j)(3)(ii), an individualized assessment must still take place. To undertake that individualized assessment, courts have required some evidence of the plaintiff's substantial limitation—even when the limitation seems self-evident in context.

*Alston v. Park Pleasant, Inc.*, 679 F. App'x 169, 172 (3d Cir. 2017); *see also Donaldson v. Trae-Fuels, LLC*, 399 F. Supp. 3d 555, 559 (W.D. Va. 2019); *Jeffries v. Wal-Mart Stores E.*, No. GJH-15-473, 2016 WL 3771241, at *3 (D. Md. July 11, 2016), *aff'd sub nom. Jeffries v. Wal-Mart Stores E., L.P.*, 669 F. App'x 634 (4th Cir. 2016); *Punt v. Kelly Servs.*, No. 14-CV-02560-CMA-MJW, 2016 WL 67654, at *7–8 (D. Colo. Jan. 6, 2016), *aff'd*, 862 F.3d 1040 (10th Cir. 2017). The relevant inquiry is how the impairment impacts the claimant's life activity, in comparison with the general population. *Barlia*, 721 F. App'x at 446. "[U]sually [this comparison] will not require scientific, medical, or statistical analysis." *Id.* (quoting 29 C.F.R. § 1630.2(j)(1)(v)); *cf. Baum v. Metro Restoration Servs., Inc.*, 764 F. App'x 543, 546 (6th Cir. 2019) (concluding that the plaintiff could not establish an actual disability without expert testimony "because his impairments, unlike more common or less complicated ones, require[d] medical knowledge to understand").

Watkins has provided enough, at this stage, to submit the issue of whether she was actually disabled under the ADA to a jury. In the Complaint, she alleged that breast cancer substantially impaired normal cell growth. DE #1-1 at 7, ¶ 18. And Plaintiff testified that, at the time of the challenged employment action, she had been diagnosed with a "very aggressive" form of nearly stage III invasive breast cancer. DE #26-2 at 31, 38. She had been diagnosed, biopsy proven, at the time of the Shriners separation. The ensuing treatment included surgery, chemotherapy, and radiation. *See* DE #26-2 at 33–35 (Watkins Dep.). This is a strong indication of how the invasive nature of the ductal breast cancer modified Watkins's cell-growth normalcy. From a lay perspective, and even without medical documentation or expert testimony, a juror could reasonably infer that Watkins's cancer substantially impaired her body's ability to normally grow

and produce cells, when compared with the general, non-cancer-patient population.[9] Given the low actual disability bar, the general presumption that cancer qualifies under the ADA as amended, and the evident serious nature of Watkins's particular diagnosis, the individual circumstances of Plaintiff's case could fairly support a jury finding that she was actually disabled for ADA purposes. Notably, Felder—Defendant's own HR Director—testified that cancer would "absolutely" be an ADA-qualifying disability. *See* DE #29-4 at 12 (Felder Dep.).

The regarded-as prong likewise presents a fact, and thus a jury, question in this case. "An individual qualifies as disabled under the regarded-as prong" where she has "(1) establish[ed] that . . . she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity and (2) the impairment is not transitory and minor." *Barlia*, 721 F. App'x at 445. It is undisputed that Knoche and Felder knew of Watkins's breast cancer diagnosis; such impairment is neither transitory nor minor. If a jury also credited Plaintiff's testimony that Knoche and Felder informed her that Shriners could not "secure her position" because of resulting cancer treatment needs, and thus coerced her into rescinding her job acceptance to avoid being blacklisted from future position openings—a version of the facts a jury could reasonably accept, per the record—it could fairly conclude that Shriners forced Watkins to give up the Revenue Cycle

---

[9] The Court thus need not, at this juncture, resolve the late-expert-disclosure issue surrounding the Menifee affidavit attached to Plaintiff's summary judgment response. *See* DE #29-2. Menifee's affidavit (like Watkins's own, *see* DE #29-1) largely reiterates facts already in the record, and expert medical evidence is not needed to rule on the instant motion. Shriners does not contest the February 2018 diagnosis. If Plaintiff seeks leave to present untimely disclosed expert proof at trial (and she does not do so in DE #29; she simply attaches the affidavit without addressing the discovery potential violation), she may so move, and the Court would resolve the matter on full briefing. As to Watkins's own affidavit, *see* DE #29-1, the Court here analyzes the deposition testimony, but hardly sees the type of disqualifying discrepancies between Watkins's deposition and her affidavit that Shriners purports to decry.

Coordinator position because of Shriners's perception of her illness. In other words, a jury, if crediting Watkins, could reasonably find that Shriners perceived Watkins as seriously ill and, not wanting to deal with the hassle of accommodating a new cancer-patient employee, convinced her that she would be categorically unable to fulfill the position's duties (primarily the attendance obligations) and forced her to rescind the acceptance. *See Baum*, 764 F. App'x at 547 (finding that a fact issue remained as to whether the plaintiff qualified under the "regarded-as" prong, where the employer knew of his impairment, and a jury could have credited his testimony that he was terminated because of his "health issues and doctors' appointments"). The regarded-as prong thus remains an open avenue to ADA protection in this case. In any event, Watkins "can proceed to trial without deciding under which prong she is covered[,]" and a jury must weigh the competing versions of events and the various witnesses' credibility to decide which prong, if either, ultimately affords Watkins relief. *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999).

*Adverse Employment Action*

The second contested issue is whether Shriners actually took any adverse employment action against Watkins. The parties' versions of events are in stark contrast on the topic; the resulting fact dispute precludes summary judgment as to this element. Per Shriners, Watkins unilaterally and voluntarily decided she no longer wanted to accept and begin the new position, as a result of her diagnosis, and rescinded her acceptance accordingly. Per Watkins, Shriners informed her that it could no longer guarantee her the position, as her cancer diagnosis and resulting treatment needs would inevitably lead to discipline, under a strict three-absence policy, and ultimate termination; and—to at least permit the possibility of consideration in the future—Watkins was required to rescind her acceptance of the position offer in writing.

14

Of course, "[w]hen an employee voluntarily resigns, [s]he cannot claim that [s]he suffered an adverse employment decision under the ADA[.]" *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447 (6th Cir. 1999); *accord Rosteutcher v. MidMichigan Physicians Grp.*, 332 F. Supp. 2d 1049, 1060 (E.D. Mich. 2004). However, per Watkins's testimony (which is arguably consistent with surrounding proof in the record, such as Howell's testimony and the language of her email to Shriners rescinding the position acceptance), her "decision" to rescind the acceptance was not voluntary at all; rather, it was coerced, and in fact mandated, by Knoche (and, indirectly, by Felder's view that the position was no longer "secured" for Watkins). A jury must decide which version of events to credit and whom to believe. Summary judgment is thus inapt.

### D. ADA Failure to Accommodate Claim

A plaintiff claiming that an employer failed to accommodate her disability must show that:

(1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation.

*Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982–83 (6th Cir. 2011). Failure to accommodate claims inherently rely upon direct evidence. *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 298 (6th Cir. 2019) (quoting *Kleiber*, 485 F.3d at 868) (observing that "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination"). The first element of such a claim—whether Watkins was disabled under the ADA—mirrors the first element in an outright disability discrimination claim, with one exception: An employer is not required to accommodate a plaintiff qualifying as disabled under only the "regarded-as" prong. *See, e.g.*, *West v. United Parcel Serv., Inc.*, No. 3:10-CV-716-H, 2011 WL 1539792, at *2 (W.D. Ky. Apr. 22, 2011) (citing *Workman*, 165 F.3d at 467) ("[T]he Sixth Circuit has held that employers do not owe a duty to

accommodate an employee who is only regarded as having a disability."); *Stinson v. Nissan N. Am., Inc.*, No. 3:18-CV-0145, 2019 WL 6174841, at *9 (M.D. Tenn. Nov. 20, 2019) (citing 42 U.S.C. § 12201(h) and 29 C.F.R. § 1630.9(e)). Watkins, though, for the reasons previously discussed, has adduced enough evidence to warrant jury submission under the actual disability prong. She thus clears the first hurdle of a failure to accommodate claim. Further, as noted, Defendant does not argue that Watkins was not otherwise qualified for the Revenue Cycle Coordinator position. Nor is there any dispute as to whether Shriners knew of Watkins's breast cancer, an impairment, when separation occurred. Accordingly, only the fourth and fifth elements require particular analysis.

"[T]he plaintiff 'bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable.'" *Keogh v. Concentra Health Servs., Inc.*, 752 F. App'x 316, 326 (6th Cir. 2018) (quoting *Kleiber*, 485 F.3d at 870). A reasonable accommodation may include, among other things, a "part-time or modified work schedule[]"). 42 U.S.C. § 12111(9)(B). Shriners does not contend that a modified work schedule, or exceptions to the three-absence policy, would have been unreasonable. Rather, Defendant's position is simply that Watkins did not request such accommodations. Plaintiff, though, testified that she expressly inquired as to her options concerning time off of work for appointments, or modified scheduling to accommodate her treatment, during the February 15 call. *See, e.g.,* DE #26-2 at 22 (Watkins Dep.) ("I asked them how my treatments would affect my schedule, if I had to have treatments, how would it affect my schedule, what are their guidelines and rules."); *id.* at 40 (". . . I asked if I had to miss doctor's appointments and if I was going to treatments if I could still work for Shriners. And I was told that if I missed more than three occurrences for appointments that . . . I could not have my position secured.").

16

Critically, "[a] request for accommodation can be inferred by context[,]" *Aldini v. Kroger Co. of Michigan*, 628 Fed. Appx. 347, 350–51 (6th Cir. 2015), and the ADA "do[es] not require 'magic words' for a request for accommodation to be valid[,]" *Keogh*, 752 F. App'x at 326 (citation omitted). Watkins claims she expressed to Shriners that she wanted to keep the position, thought she could do the job even with her cancer treatments, and asked Knoche and Felder whether she could miss work for appointments without being penalized. Per Watkins, this prompted Knoche and Felder to explain the three-absence policy and advise that any such absence during the probationary period—even if it were for cancer treatment—would count as an "occurrence" and push her closer toward probable termination. Watkins testified that the three discussed FMLA applicability, but Knoche and Felder stated that it afforded her no protection, at least during a probationary period at Shriners. *See* DE #26-2 at 19 (Watkins Dep.) ("Ambra just stated that because I would be a new employee, I would not qualify under the FMLA guidelines, that I had to be there so many days in order to qualify for that[.]"); *id.* at 20 ("Debra [restated] the fact that . . . because of the FMLA guidelines and treatments that I wouldn't be allowed to take off without getting on probationary action."); *id.* at 41 ("[I asked whether] if I did need to go to doctor's appointments, if I would be allowed to go and if it would be okay for me to either come in or take vacation days or anything like that. And they stated that no, that I would not. Because of the FMLA I could not be protected."). Watkins further testified that she specifically notified Knoche, on February 14, of the scheduled February 27 medical appointment to define her treatment plan; per Watkins's impression of the conversation, Knoche expressed doubt that Plaintiff could miss work for it without negative consequences, but advised that she would have to check with HR (regarding absence allowance for the February 27 date and any others). DE #26-2 at 28–29 (Watkins Dep.). Felder's alleged description of the strict three-absence policy, without noted exceptions, followed

the next day, despite Felder's knowledge of Watkins's "situation" and consideration of the "options" available to her. *Id.* at 19.

Taken in the light most favorable to Watkins, Plaintiff's testimony demonstrates that she definitively requested that she be able to miss work at times for cancer-related appointments—at minimum on February 27, as well as on other anticipated dates as later scheduled—and Shriners categorically refused to alter its uniformly applied absence policy in response. *Cf. Keogh*, 752 F. App'x at 326 (concluding that the plaintiff did not propose any accommodation where the "plaintiff's own testimony show[ed] that no such request was made, and he was still weighing his options[,]" and "hemming and hawing" as to whether he in fact desired any sort of accommodation). Of course, Knoche's and Felder's testimony categorically conflicts with Watkins's account; they maintain that she asked no questions during the February 15 call and requested nothing. The Court, though, cannot resolve the testimonial disagreement on summary judgment; such proof weighing is properly for the trier of fact.

If a jury credited Watkins's testimony and found that she requested permission to miss work for appointments, on February 27 and as otherwise needed, it could conclude that Shriners's wholesale failure to accommodate—or even to meaningfully *attempt* to accommodate—Watkins's disability-related medical appointments triggers ADA liability. *See Lafata v. Church of Christ Home for Aged*, 325 F. App'x 416, 422 (6th Cir. 2009) (quoting *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 556 (6th Cir. 2008) ("[T]his Court has held that 'the interactive process is mandatory, and both parties have a duty to participate in good faith.'"); *id.* (quoting *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *vacated on other grounds*, 122 S. Ct. 1516 (2002)) ("Employers 'who fail to engage in the interactive process in good faith[ ] face liability [under the ADA] if a reasonable accommodation would have been possible.'");

*Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 203 (6th Cir. 2010) ("An employer has sufficiently acted in good faith when it readily meets with the employee, discusses any reasonable accommodations, and suggests other possible positions for the plaintiff."); *accord Kovac v. Superior Dairy, Inc.*, 998 F. Supp. 2d 609, 620 (N.D. Ohio 2014). A reasonable jury, believing Watkins, could find that Shriners refused any interactive discussion about Plaintiff's cancer-related absence need, rejected her request for schedule modification based on a blanket rule and without explaining why it could not accommodate her treatment, and failed to propose any alternative. Watkins has, on this contested record, justified jury submission on the failure to accommodate theory.[10]

### E. ADA Retaliation Claim

Watkins claims that Shriners retaliated against her under the ADA, for requesting schedule modification related to her cancer treatments, by coercing her to rescind her position acceptance. The claim, involving the same elements already analyzed in detail, requires little discussion. In contrast with failure to accommodate claims, retaliation claims often are "properly analyzed under

---

[10] The Court observes a couple of things about Shriners's arguments. First, as to any accommodation request, Shriners contends the appointment situation was "completely hypothetical." DE #26-1 at 9. The record shows that Watkins had biopsy-confirmed Invasive Ductal Carcinoma. She had a treatment planning meeting the day after her Shriners start date. That she would require treatment is hardly a hypothetical topic. *See* DE #26-2 at 41 (Watkins Dep.) ("I knew there was going to be a treatment plan in place. I just did not have the specifics."). A query about the effect of certain, if non-calendared, absences for cancer treatment is adequately particular as an accommodation request. Second, Shriners slaloms through old law in a case governed by the new ADAAA standards in making its arguments about cancer. It is surprising that a health care entity, with an HR Director conceding that cancer "absolutely" is a disability under the ADAAA, would in this Court contest whether Invasive Ductal Carcinoma at least raises a jury issue on normal cell-growth limitation. As the CDC describes the disease: "Breast cancer is a disease in which cells in the breast grow out of control." *What is Breast Cancer?*, Centers for Disease Control and Prevention (last visited May 7, 2020), cdc.gov/cancer/breast/basic_info/what-is-breast-cancer.htm.

the indirect evidence test[.]" *Morrissey*, 946 F.3d at 304. "To establish a prima facie case of retaliation, a plaintiff must show that "(1) [she] engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Id.* The burden then "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the" challenged action. *McDonnell Douglas Corp. v. Green*, 93 S. Ct. 1817, 1824 (1973). If the employer does so, the employee has the opportunity to demonstrate that the proffered reason is mere pretext for unlawful discrimination. *Id.* at 1825.

In the ADA context, an employee's request for a reasonable accommodation constitutes protected activity. *Morrissey*, 946 F.3d at 304. As explained in the preceding section, based on the evidence of record, a reasonable jury could conclude that Watkins requested schedule modification to accommodate her cancer treatments—an accommodation that is contemplated in the ADA and presumably reasonable, *see* 42 U.S.C. § 12111(9)(B), and Shriners has not argued otherwise. Nor could there be any argument that, based on Watkins's version of events, the Shriners decisionmakers (Knoche and Felder) did not know of Watkins's accommodation request, made directly to them during the February 15 call. Further, for the reasons likewise already discussed, a jury could determine that Plaintiff's rescission of the position acceptance was not voluntary, but coerced, under the circumstances. Finally, reasonable jurors could additionally find that Knoche and/or Felder—anticipating the added work associated with obliging Watkins's scheduling needs for an indefinite period upon her start at Shriners—coerced her into rescinding the acceptance expressly because of a disability-tied accommodation request. Plaintiff has thus satisfied her prima facie burden; and, Shriners—focused only on rebutting the prima facie case elements—has offered no other reason for the challenged February 15 action. Given the extant factual questions—as to,

20

namely, whether Watkins legitimately sought accommodation and whether her rescission of the position acceptance was voluntary—summary judgment is not warranted on the ADA retaliation claim.

### F. KCRA Claims

Lastly, the Court confronts the state claims. The KCRA provides in pertinent part: "It is an unlawful practice for an employer . . . to discharge any individual . . . because the person is a qualified individual with a disability[.]" KRS § 344.040(1)(a). Because the KCRA largely parallels the ADA, courts traditionally interpret them consistently. *See, e.g.*, *Lafferty v. United Parcel Serv., Inc.*, 186 F. Supp. 3d 702, 707–08 (W.D. Ky. 2016) (citing *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003); *Bryson v. Regis Corp.*, 498 F.3d 561, 574 (6th Cir. 2007); *Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 526 (6th Cir. 2015)) ("Because the language of the KCRA mirrors (for the most part) that of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, courts interpret the KCRA consistent with the ADA."); *see also Webb v. Humana*, 819 F. Supp. 2d 641, 644–45 (W.D. Ky. 2011) ("The language of the KCRA mirrors that of federal anti-discrimination law, and courts have interpreted the Kentucky Act consistently therewith."); *accord Brohm v. JH Properties, Inc.*, 149 F.3d 517, 520 (6th Cir. 1998).

However, the KCRA did not incorporate the 2008 ADAAA changes, and most courts continue to apply pre-2008 ADA jurisprudence to the KCRA analysis. *See Krueger v. Home Depot USA, Inc.*, 674 F. App'x 490, 494 (6th Cir. 2017) ("[T]he Kentucky legislature adopted the language in the KCRA in 1992 and intended it to reflect the language of the ADA at that time, not the subsequent amendments."); *Breen v. Infiltrator Systems*, 417 F. App'x 483, 486 (6th Cir. 2011) ("[T]h[e] amendment has yet to be incorporated into the Kentucky statute, *see* K.R.S. § 344.010(4), so the pre-2008 ADA standards apply to [Plaintiff]'s claim."); *Sanders v. Bemis Co., Inc.*, No.

3:16-cv-14-GFVT, 2017 WL 3401277, *1, *5 (E.D. Ky. Aug. 8, 2017) ("[T]he KCRA is interpreted consistent with pre-ADAAA, rather than post-ADAAA, jurisprudence."); *Lafferty*, 186 F. Supp. 3d at 707 n.3 (W.D. Ky. 2016) (noting that "[f]ederal courts continue to interpret the KCRA consistent with pre-ADAAA jurisprudence" and collecting supporting cases); *Larison v. Home of the Innocents*, 551 S.W.3d 36, 43 (Ky. 2018) ("[N]o matter these current definitions, 'the KCRA retains the [ADA's] former definition of disability[,]' prior to the 2008 Amendments of the federal law.") (quoting *Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F. Supp. 2d 653, 657 n.2 (W.D. Ky. 2012)).

Indeed, the *Azzam* court emphasized the imprudence of "assum[ing] that the Kentucky legislature, by drafting language in 1992 that mirrored federal law at the time, *see* 1992 Ky. Acts 282, § 1, intended to incorporate federal legislative alterations that occurred in 2008." 855 F. Supp. 2d at 657 n.2. And, the very small minority of cases that have applied the ADAAA to KCRA claims either has done so without analysis, or has indiscriminately applied ADAAA standards to scenarios involving both ADA and KCRA counts; moreover, such cases still rely heavily on pre-2008 case law.[11] Both the Sixth Circuit, and Kentucky in *Larison*, went the other way; this

---

[11] *See Tanner v. Jefferson Cty. Bd. of Educ.*, No. 2015-CA-1795-MR, 2017 WL 2332681, *1, *2 (Ky. Ct. App. May 26, 2017) (unpublished) (citing the ADAAA without analysis and relying primarily on pre-2008 case law); *Gesegnet v. J.B. Hunt Transport, Inc.*, No. 3:09-cv-828-JGH, 2011 WL 2119248, *1, *2 (W.D. Ky. May 26, 2011) (applying the ADAAA to both federal and KCRA disability discrimination claims "[b]ecause the events in question took place after the [ADAAA's] effective date" without differentiating between the two claims); *Banks*, 610 F. App'x at 526–32 (applying the ADAAA to a KCRA discrimination claim without analysis, while relying almost entirely on pre-2008 cases and nevertheless noting that the KCRA's purpose is "[t]o provide for execution within the state of the policies embodies in . . . the Americans with Disabilities Act of 1990" (quoting KRS § 344.020(a)); *Kimbro v. Kentucky*, No. 5:13-cv-215, 2015 WL 3687672, *1, *3–*5 (W.D. Ky. June 12, 2015) (applying the ADAAA indiscriminately to both federal and KCRA disability discrimination claims). Nothing but common lineage and traditional parallelism would warrant treating Kentucky's 1992 enactment as modified by Congress sixteen years later. Those, as a matter of controlling text, are not enough.

effectively is controlling authority. Thus, this Court must "continue to apply pre-ADAAA jurisprudence to [the KCRA] . . . '[u]ntil such time as the Kentucky Supreme Court or General Assembly speaks on this issue[.]'" *Sanders*, 2017 WL 3401277 at *5 n.3 (quoting *Lafferty*, 186 F. Supp. 3d at 707 n.3)).

An individual qualifies for disability protection under the KCRA if she has: "(a) A physical or mental impairment that substantially limits one (1) or more major life activities . . . (b) A record of such an impairment; or (c) [been] regarded as having such an impairment." KRS § 344.010(4). Watkins does little to engage the distinct (and more stringent) KCRA disability standard. Plaintiff's actual disability argument focuses solely on the post-amendment standards. *See, e.g.*, DE #29 at 12 ("Under modern law, Invasive Ductal Carcinoma–breast cancer–is a disability that merits the protections of the ADA."); *id.* at 14 ("Shriners cannot find post-Amendment authority to suggest that cancer is not a disability *because that simply is not the law anymore*.") (emphasis in original); *id.* at 15 ("In sum, there can be no credible dispute that cancer is an actual disability under modern disability law."); *see generally id.* at 13–15 (discussing whether cancer is a qualifying disability only under ADAAA standards).

Unlike decisions applying the updated federal statute, pre-ADAAA cases generally have held that cancer is not a qualifying disability. *See, e.g.*, *Suchanek v. Univ. of Kentucky*, No. CIV.A. 3:10-19-DCR, 2011 WL 3045986, at *7 (E.D. Ky. July 25, 2011) (observing that "[o]ne court has explained that [b]reast cancer *per se* is not sufficient to render a person diagnosed with, or suffering from, said condition automatically disabled") (internal quotation marks and citation omitted); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 191 (5th Cir. 1996) (finding no material fact issue as to whether cancer substantially limited the life activity of working); *Schwertfager v. City of Boynton Beach*, 42 F. Supp. 2d 1347, 1360 (S.D. Fla. 1999) (characterizing breast cancer as an

insufficiently permanent impairment under the old standard and finding that it did not substantially impair the plaintiff's work); *Alston*, 679 F. App'x at 171–72 (comparing *EEOC v. R.J. Gallagher Co.*, 181 F.3d 645, 653-54 (5th Cir. 1999) (finding that cancer did not qualify under the pre-amendment standard), with *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 756 (8th Cir. 2016) (finding that cancer qualified, under the updated statute, because it considers "the functioning of one's immune system [ ] a major life activity"). Plaintiff—declining to substantively address the actual disability standard under the KCRA—neither confronts the bulk of cases declining to find that cancer qualified under the former ADA standard, nor offers any reason why it would qualify under that narrower standard in this particular case. Watkins does not argue that her breast cancer actually substantially limited any pre-ADAAA-qualifying major life activity. The Court thus cannot find, under either the general application or based on an individualized determination in this case, that she qualified under the KCRA "actual disability" prong.

Rather, Watkins legitimately (albeit briefly) pursues KCRA coverage under only the "regarded-as" prong. In arguing that she qualifies, Plaintiff focuses on the life activity of working, contending that "Shriners considered her impaired across a broad range of jobs." DE #29 at 18. In the sole paragraph devoted to qualification under the "regarded-as" KCRA prong, Watkins claims that "Knoche and Felder told [her] that she could not obtain work due to a general policy related to attendance and occurrences, not an attendance policy that related solely to the revenue cycle coordinator position." *Id.* The record, though, does not necessarily support this view; neither Watkins, nor Knoche or Felder, directly testified that the policy applied broadly across a panoply of hospital positions. Rather, it is clear from Watkins's testimony at least that Knoche and Felder viewed the Revenue Cycle Coordinator position as "unique" and, thus, subject to less absence flexibility. *See* DE #26-2 at 19 (Watkins Dep.) (recalling Knoche's guidance "that because she did

not have anybody to cover [Plaintiff] in that position, it was a unique position, that [Watkins] wouldn't be able to take off in the first 90 days because . . . if [she] needed to take more than three times off, [Knoche] could not secure [her] position"). Contrary to Watkins's DE #29 view, the record suggests that the strict approach to attendance—and inability or unwillingness to deviate from the three-absence policy—was specific to the Revenue Cycle Coordinator role. In sum, Watkins has not sufficiently shown that Shriners regarded her as substantially limited across a broad range of jobs in her field. Accordingly, because Plaintiff has not demonstrated that she had a KCRA-qualifying disability—a required threshold showing, for all asserted KCRA claim varieties—summary judgment is proper on the state law claims.

**G. Conclusion**

For all of the reasons discussed, the Court **GRANTS** DE #26 **in part** and **DENIES** it **in part**. Watkins has not offered enough proof to overcome Shriners's well-supported summary judgment effort as to the KCRA claims. She has, though, demonstrated the existence of fact questions precluding summary judgment on the ADA claims; those, thus, will proceed to a jury.

This the 8th day of May, 2020.

Signed By:

_Robert E. Wier_

**United States District Judge**